FILED
2008 Jul-30 PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| Elijah Bell, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 07-G-2184-S |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The plaintiff, Elijah Bell, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying his application for Social Security Benefits. Plaintiff timely pursued and exhausted his administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations

omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth</u>, at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

    (1)    whether the claimant is currently employed;

    (2)    whether she has a severe impairment;

    (3)    whether her impairment meets or equals one listed by the Secretary;

    (4)    whether the claimant can perform her past work; and

(5)     whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).  "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job."  Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the instant case, the ALJ, Jerry M. Lang, determined the plaintiff met the first two tests, but concluded did not suffer from a listed impairment.  The ALJ found the plaintiff unable to perform his past relevant work.  Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do."  Foote, at 1559.  When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids).  Foote, at 1558-59.  The presence of a non-exertional impairment (such as pain, fatigue or mental illness) also prevents exclusive reliance on the grids.  Foote, at 1559.  In such cases "the [Commissioner] must seek expert vocational testimony.  Foote, at 1559.

## DISCUSSION

In the present case the plaintiff alleges disability due to gout, osteoarthritis, and degenerative disc disease.  The plaintiff filed an application for SSI benefits on

February 14, 2005.  SSI benefits are not payable prior to the month following the month in which the application was filed.  Therefore, the relevant inquiry is whether the plaintiff was disabled on February 14, 2005.  The plaintiff was born December 5, 1952, which means he was over 50 years of age at the time he filed for benefits.[1]  Therefore, if the plaintiff were limited to no more than sedentary work and had no transferable skills he would be disabled under grid rule 201.14.

The ALJ found the plaintiff was able to do light work as defined in the Social Security Rules and Regulations with only mild to moderate pain.  Record 24.  This finding is not supported by substantial evidence.  The Commissioner's consultative physician, Dr. Dockery, limited the plaintiff to a total of two hours of combined standing and walking in an eight hour day.  Record 172.  This finding is inconsistent with light work.  The Commissioner's regulations define light work as follows:  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 404.1567(b).  The definition of light work has been further clarified by Social Security Ruling 83-10:

> The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing

---

[1] The ALJ improperly considered the plaintiff's age on the alleged disability onset date, which was 46 years old.  Record 28.  This also caused the ALJ to improperly find the transferability of skills irrelevant to his decision.  Record 29.

4

and pulling of arm-hand or leg-foot controls, which require greater exertion
than in sedentary work; e.g., mattress sewing machine operator,
motor-grader operator, and road-roller operator (skilled and semiskilled jobs
in these particular instances). Relatively few unskilled light jobs are
performed in a seated position.

<u>"Frequent" means occurring from one-third to two-thirds of the time. Since
frequent lifting or carrying requires being on one's feet up to two- thirds of a
workday, the full range of light work requires standing or walking, off and
on, for a total of approximately 6 hours of an 8-hour workday.</u> Sitting may
occur intermittently during the remaining time. The lifting requirement for
the majority of light jobs can be accomplished with occasional, rather than
frequent, stooping. Many unskilled light jobs are performed primarily in one
location, with the ability to stand being more critical than the ability to walk.
They require use of arms and hands to grasp and to hold and turn objects,
and they generally do not require use of the fingers for fine activities to the
extent required in much sedentary work.

SSR 83-10 **5-6 (emphasis added).

The ALJ did not give any specific reason for refusing to credit the opinion of Dr. Dockery. Moreover, Dr. Dockery's examination contains ample findings to support his conclusion. Dr. Dockery found the plaintiff had an antalgic gait "in that he limped and had decreased stance time on his left lower extremity." Record 169. The plaintiff was unable to attempt heel toe walking "secondary to likely complaints of pain in the left lower extremity." Record 169. The plaintiff complained of pain with range of motion testing in the left ankle, shoulders, and wrist joints. Record 170. Dr. Dockery found tenderness to palpation over the left wrist joint and left hand fifth MCP joint. Record 170. Dr. Dockery noted the following findings on physical examination as well:

The claimant did have increased warmth, erythema, swelling, and tenderness
to palpation in the right AC joint. The claimant also had significant
erythematous indurated swollen warm shiny inflammation, cellulitic in

5

>appearance that extended from his mid–calf circumferentially around his leg distally toward the distal portion of the dorsum of his foot.  This is on the left lower extremity.  The claimant noted significant tenderness to palpation worse at the left ankle joint under this rash.

Record 170-171.  Dr. Dockery noted the plaintiff "had to perform a lateral lean of his dorsolumbar spine to the right in order to slide the jacket arm over his right upper extremity, thus preventing significant right shoulder abduction/flexion that one usually would use to put on the jacket quickly and efficiently."  Record 171.  During motor strength testing the plaintiff exhibited less than full strength in several areas secondary to complaints of pain.  Record 171.  Dr. Dockery diagnosed gouty arthritis.  Record 171.

In assessing the plaintiff's functional capacity Dr. Dockery stated as follows: "Based on today's physical examination with the significant erythema, increased warmth, swelling of the left ankle significant for inflammation, the number of hours the claimant can be expected to stand and walk during an eight-hour workday is two hours."  Record 171-172.  Again, the ALJ gave no reason not to credit the opinions of Dr. Dockery.

Dr. Dockery's finding that the plaintiff could not do light work is supported by records from the plaintiff's treating doctors following his traffic accident in December 2004.  An MRI on January 13, 2005, showed a disc herniation at C6-7 with disc spur complex at C5-6 with left-sided foraminal narrowing due to spurring.  Record to 43.  The plaintiff received chiropractic treatment from January 2005 through April 18, 2005.  These treatment notes show the plaintiff initially reported pain at a level of 10 out of 10 initially.

By the end of his chiropractic treatment, the plaintiff was reporting pain at a level of six out of 10.

Treatment notes from the Cooper Green hospital show that on February 6, 2005, the plaintiff complained of the left hand swelling and shoulder swelling following a motor vehicle accident in December 2004.  Record 194.  This was initially diagnosed as a sprain, but x-rays on March 2, 2005, showed a fracture of the navicular bone and diffuse osteoporosis of the carpal bones.  Record 201.  On February 9, 2005, examination revealed a swollen tender wrist.  Record 193.  On February 23, 2005, the plaintiff continued to complain of wrist pain.  Record 192.  On March 2, 2005, the plaintiff's wrist pain had improved, but he now complained of knee and ankle pain.  Record 191.  On May 9, 2005, he was evaluated for pain in the lower extremities.  Record 190.  He was diagnosed with poly-arthralgia, and degenerative joint disease.  Record 190.

September 29, 2005, the plaintiff saw Dr. Grelier, who treated him previously for gout.  He told Dr. Grelier that his back was hurting, particularly around his shoulders.  He also complained of pain in his knees, left leg, left side and particularly his hands.  Record 323.  The musculoskeletal examination showed "excellent range of motion of his shoulder, elbows.  His hands show no synovitis.  Hips move well.  His knees are negative.  Ankles and feet good."  Record 323.  Dr. Grelier's diagnostic impression was as follows: 1) history of gout; 2) history of motor vehicle accident six months ago (December 2004); and 3) doubt any inflammatory rheumatic problem at the present time.  Record 323. The plan was for further testing and he was to return in four weeks.

On October 27, 2005, Dr. Grelier noted that on the laboratory screening "there was nothing much there." Record 321. "He had some RNP antibodies and a mild elevation in his gamma – globulin, very nonspecific. His anti-CCP antibody was negative. His anti-DNAs were normal. His sed rate was 11, CRP 0.3, and ANA positive at 149, which is minimally elevated." Record 321. Dr. Grelier noted: "I have a hard time telling exactly what Mr. Bell is after in terms of his pain problems, as he just complains about aches and pains and discomfort, but particularly focalized is to his back perhaps. He also though mentions his knees, left leg, left side particularly his hands, which he states always 'hurt.'" Record 321. Physical examination showed good motion of the shoulders and elbows and hands. His hips moved well. His knees were negative. His ankles and feet moved well. The diagnostic impression was: 1) History of gout; 2) Arthralgias; 3) Probable osteoporosis; 4) Widespread osteoarthritis; and 5) Osteopenia. Record 321.

On January 19, 2006, the plaintiff saw Dr. Abbott, to whom he had been transferred by Dr. Grelier. The plaintiff reported that he continued to have flare ups of his arthritis in multiple joints. Record 316. Dr. Abbott noted the plaintiff continued "to describe an arthropathy in his great toes which comes about every three months or so consistent with gout." Record 316. Examination that date showed tenderness over the MCP joints. There was tenderness over the left wrist with obvious synovitis. There was a slight limitation of range of motion in the left wrist. There was no synovitis in the feet, ankles or knees. The diagnostic impression contains the following: "follow-up of

polyarticular joint pain with a compelling history for podagra[2] though no crystal diagnosis and no evidence of articular inflammation on physical examination today." Record 317.

On April 7, 2006, the plaintiff saw Dr. Abbott for a flare of gout into his right great toe. He was also hurting into his ankles and midfoot and had right knee pain. On physical examination Dr. Abbott found "definite inflammation in the right great toe" with IP joint redness. Record 312. There was also swelling in the right ankle with tenderness. Record 312. The diagnostic impression included "polyarticular gout, currently with an acute flare." Record 312. He was prescribed a Medrol dose pack for the acute flare. Record 312.

On May 19, 2006, the plaintiff returned for a follow-up. On examination there was "slight tenderness in the right great toe IP joint, but definite improvement from previous." Record 309. The diagnostic impression included polyarticular gout, in need of uric acid lowering therapy.

On June 30, 2006, Dr. Abbott noted: "Today, he states that he is having some difficulties with his right toe but 'not pronounced.' He is having mostly soreness in his heels on the under surfaces of his feet." Record 304. He is having some neck pain, "which started in recent days to be more pronounced. He is having some difficulty turning his head." Record 304. Dr. Abbott found nothing that looked like acute gout. Record 304. There was some slight tenderness in the MTP's and some tenderness on the under

---

[2] Podagra is "gouty pain in the great toe." Dorland's Illustrated Medical Dictionary 1319 (28th Edition).

surfaces of the heels. Dr. Abbott found a full cervical range of motion. Record 304. Dr. Abbott's diagnostic impression included the following: "Gout, appears fairly well controlled at the present time." Record 304. X-rays revealed degenerative changes in the cervical spine and the diagnostic impression included cervical degenerative disease. Record 304.

The medical records demonstrate that the plaintiff suffers from gouty arthritis, which flares from time to time. He also has degenerative joint disease of the cervical spine. The Commissioner's own consultative physician opined that the plaintiff would be unable to stand and walk for more than two hours in an eight-hour day. This opinion was contradicted by no other medical evidence of record and was the only opinion from an examining physician about the plaintiff's ability to perform work related activities. The treating records show the plaintiff sought treatment for gouty arthritis and cervical joint disease on numerous occasions. In light of the treatment records and Dr. Dockery's functional assessment, the ALJ's finding that the plaintiff could perform light work is not supported by substantial evidence. The medical evidence of record, including Dr. Dockery's functional assessment, does not support a finding that the plaintiff can perform more than sedentary work after his motor vehicle accident in December 2004.[3]

---

[3] Because the plaintiff may not receive SSI benefits prior to the filing date, February 14, 2005, it is not necessary for the court to consider whether the plaintiff was able to perform greater than sedentary work prior to 2005.

Because the ALJ found the plaintiff cannot perform his past relevant work, the burden shifted of the Commissioner to show the plaintiff could perform other jobs. The vocational expert testified that the plaintiff's past relevant work had been as a route driver with a pizza company, which was light and unskilled, and as a courier for a pharmaceutical company, which was somewhere between light and medium and at the low end of semiskilled.  Record 402.  The ALJ did not elicit any testimony from the vocational expert about whether the plaintiff had transferable skills from his job as a courier. Therefore, there is no evidence to support a finding of transferable skills from that job. The plaintiff was 54 years old at the time he filed his application, and was therefore closely approaching advanced age.  Therefore, grid rule 201.14 requires a finding of disabled.  The Commissioner did not carry his burden at step five of showing the plaintiff could perform other work.  Accordingly, the plaintiff's disabled under the terms of the Social Security Act.

DONE and ORDERED 30 July 2008.

_____
UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.